NEW PHILADELPHIA, The (BRADY v.). See Case No. 1,797.

## Case No. 10,185.

### The NEWPORT.

[5 Ben. 231;[1] 14 Int. Rev. Rec. 37.]

District Court, S. D. New York. June, 1871.

COLLISION IN EAST RIVER—STEAMBOAT OVERTAKING ANOTHER.

1. The tug Q., with a barge in tow alongside, was bound from Jersey City to the Atlantic Basin, in Brooklyn. The steamboat N. came out from a pier in New York City, on a trip through the Sound, and swung her head to port down the North river, during which movement the Q. passed from the starboard to the port side of the N., ahead of her. The N. then swung still further to port to enter the East river, but blew a single whistle to tell the Q., as she alleged, that she intended to go outside of and

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

pass her. The Q. kept on her course, and was struck by the N. on the starboard side, and sank with the barge. *Held,* that, as the N. was behind the Q., and to starboard of her, the course up the East river which she wished to take must cross that of the Q. either ahead or astern of the Q.

[Cited in The St. Paul, Case No. 12,243.]

2. In adopting the manoeuvre of crossing ahead of the Q., the N. chose the most hazardous of the two manoeuvres, and that, under these circumstances, the burden was on her to excuse herself.

[Cited in Thompson v. The Great Republic, 23 Wall. (90 U. S.) 34.]

3. On the evidence, the excuse which she had set up, that the Q. sheered to starboard, and thus crossed her course, was not made out.

4. If the effect of the ebb tide from the East river, striking the port bow of the barge, as the Q. entered such tide, was to deflect the Q. to starboard, this was an effect which the N. could have foreseen, and guarded against by not approaching the Q. so closely.

5. If the Q. had slowed and stopped while under the bows of the N., such action, under the circumstances, would not be held to have been a fault.

In admiralty.

C. Donohue and W. J. Haskett, for libellants.

J. H. Choate and W. G. Choate, for claimants.

BLATCHFORD, District Judge. This is a libel filed by the owners of the steam propeller Quickstep against the steamboat Newport, to recover for the damages caused to the Quickstep by a collision which took place between her and the Newport on the 17th of August, 1866, shortly after 5 o'clock, p. m., in the East river, near Diamond Reef buoy, between the Battery and Governor's Island. The Quickstep, with a barge loaded with coal in tow on her port side, was bound from Jersey City to the Atlantic Basin, in Brooklyn. The Newport had left her berth at pier 28, North river, and passed down the North river and into the East river, and was bound up the East river, through Hell Gate and the Sound, to Newport, Rhode Island. The tide was about half ebb, and running with the strength of the ebb from the East river into the North river from between Governor's Island and the Battery, and also from the East river through the channel between Governor's Island and the Long Island shore. As the Newport came out of her slip heading to the west, she gradually swung to port till she headed down the North river. The Quickstep, coming from Jersey City, passed across the bows of the Newport from starboard to port of the Newport. As the Newport swung around still further to port to head through between the Battery and Governor's Island into the East river, she had the Quickstep on her port hand and ahead, and was, therefore, following and overtaking the Quickstep. Under these circumstances, it was the duty of the Newport to avoid the Quickstep,

and keep out of her way. She did not avoid her, but ran into her. The stem of the Newport struck the starboard side of the Quickstep, not far from amidships on the Quickstep, at an angle of about forty-five degrees, angling forward on the Quickstep, crushing in her side so that she sank almost immediately, as did also the coal barge and the cargo of coal. The Newport, being behind the Quickstep, and to the starboard of the Quickstep, and the Quickstep being bound to the Atlantic Basin and the Newport being bound up the East river, the Newport could gain her course up the East river only by crossing the course of the Quickstep. This she could do, either by going under the stern of the Quickstep, or by overtaking the Quickstep and passing her, leaving her to the left and going across her bows and around her. The former was obviously the safe course. The Newport rejected that method, and undertook to accomplish the result of running around the Quickstep while the latter should keep on—a project dangerous in its inception and fatal in its result. Under these circumstances, the burden is on the Newport to excuse herself, she being the overtaking vessel, and having actually overtaken the Quickstep and run her down. The Quickstep was a small propeller. The Newport was a large and powerful side-wheel steamer.

The answer of the Newport sets up, that, after the Quickstep, coming from Jersey City, had crossed the bows of the Newport, and while the Newport was opposite Castle Garden, and the Quickstep was proceeding along the New York shore, between that shore and the Newport, the Newport sounded one blast of her whistle, to notify the Quickstep and the several other vessels which were between the Newport and the New York shore, that it was the intention of the Newport "to take the outside, and commenced gradually to turn up towards the East river, as nearly as possible in the middle of the river, at which time said steam-tug," the Quickstep, "was running a course parallel with the Newport, inside of her, on her port bow, and, to all appearance, seemed bound, like the Newport, up the East river." The answer also avers, that those in charge of the Quickstep took no notice of the whistle from the Newport; that, as the Newport, continuing her course, opened the East river, being then nearly opposite the southern extremity of the Battery and about midway between that and the buoy on Diamond Reef, the Quickstep gave a sheer towards Governor's Island, directly across the course of the Newport, and so near to her as to render a collision imminent; and that, immediately on perceiving the position in which the Quickstep had been thus placed, the wheels of the Newport were stopped and reversed, and her helm was put hard aport, in the hope, if possible, of avoiding a collision, but, at the same moment, the Quickstep also slowed her engine or stopped it wholly, by which the Quickstep was left

directly under the stem of the Newport. The answer charges, that the collision was the fault of the Quickstep in these respects: (1) In not paying due regard to the whistle of the Newport, by which the Quickstep was warned of the intention of the Newport to pass on the outside: (2) in making a sheer to starboard, and attempting to cross the bows of the Newport after the Newport had signalled her intention to take the outside; (3) in attempting to cross the known course of the Newport without notifying, by whistle or otherwise, a desire or intention to do so; (4) in slowing or stopping her engine, when she had thus been brought directly under the bows of the Newport, instead of making an effort, by press of steam, to escape the danger; (5) in not answering the Newport's whistle; (6) in not having any efficient lookout; (7) in not exercising proper care, having regard to the size and superior power of the Newport, and having full knowledge of the course to be necessarily taken by her into and up the East river.

It is manifest from the answer that it proceeds upon the theory that the Quickstep was bound up the East river, as the Newport was, and not across the East river, to the Atlantic Basin, and that the Newport, as the overtaking boat, and the faster boat, had the right to determine and announce that she would, in passing the Quickstep, pass on the starboard hand of the Quickstep, and to follow out such determination, without receiving from the Quickstep any assent to such course of proceeding. The Quickstep was, in fact, not bound up the East river, but was bound to the Atlantic Basin. The Newport could not tell where the Quickstep was bound. There was nothing in the heading, or course, or movement of the Quickstep to indicate that she was bound up the East river rather than to the Atlantic Basin. The Quickstep had not yet arrived at the point where a divergence from the course she was on would be necessary, if she were bound up the East river. In this posture of affairs, the Newport, as the answer says, whistled her determination to go outside, and commenced gradually to turn up towards the East river, the Quickstep being then on her port bow. The whistle, the answer says, was not noticed by the Quickstep. Still, as the answer says, the Newport continued her course, and, when the Newport had opened the East river, the Quickstep sheered directly across the course of the Newport, whereupon, seeing that a collision was imminent, the Newport stopped and reversed, and put her helm hard aport, and the Quickstep slowed or stopped, so as to leave herself directly under the stem of the Newport.

It is shown, by the trials of collision cases, to be very much the habit of large steamers, in dealing with small tugs, to determine on a course and announce it by whistling, and then persist in it, whether an acquiescent response is obtained or not. The case set up in this answer is one of that kind. It is manifest, that, if the Newport had kept at a proper and safe distance behind the Quickstep until she had learned satisfactorily where the Quickstep was bound, she would not then have attempted to take the outside, or to whistle the Quickstep to the inside, but would have passed under the stern of the Quickstep. And, after the Newport had whistled, and found her whistle unanswered, it was wrong in her to continue her course, as the answer says she did, and approach so close to the Quickstep. The evidence makes out three separate signals of a single whistle, each by the Newport, none of which were answered by the Quickstep. This only aggravates the fault of the Newport.

I am satisfied, on the proofs, that the Quickstep made no sheer to starboard whatever, across the bows of the Newport, but kept her course, in so far as the load she had and the tide would allow, towards her objective point in Brooklyn. As regards any effect which her load and the tide from the East river may have had upon her, she was in full view from the Newport. The effect of the tide on a small tug, so loaded, was or ought to have been known to the Newport, and, if the action of the tide, striking the port bow of the barge on the port side of the Quickstep, as they entered such tide, produced a deflection of the Quickstep and her tow to the starboard, which the Newport mistook for, and now calls, a sheer, this was a movement which the Newport could have foreseen, and could have guarded against by not allowing herself to approach so close to the Quickstep.

If there was any slowing or stopping of the engine of the Quickstep, when she was directly under the bows of the Newport, such a movement cannot be regarded as a fault. Those in charge of a small tug may well lose their self-possession, and not act with coolness or make exactly the right manoeuvre, in the moment of peril, when they see their boat about being run over by a steamer many times their size. I do not mean to say, however, that the fact of such slowing or stopping is established, or that, if it were, it would have been a wrong manoeuvre.

There was no deficiency in respect of a lookout, on the Quickstep. It was the business of the Quickstep to keep her course, to the best of her ability, and she did so. It was the business of the Newport, overtaking her, to avoid her.

The suggestion, in the answer that the Quickstep did not exercise proper care, having regard to the size and superior power of the Newport, and having full knowledge of the course to be necessarily taken by her, into and up the East river, ought properly to be reversed in its application. The Newport, being superior in size and power to the Quickstep, and approaching her from behind, and being in ignorance of whether the

Quickstep was going to the Atlantic Basin or up the East river towards Hell Gate, did not exercise proper care. She suffered herself to approach too close to the Quickstep, seeing her plainly ahead, and knowing what the tide was, and how it would affect her, so that, with the speed the Newport had, she could not, when the exigency arose, succeed, by stopping and reversing and changing her helm, in avoiding a collision. The libel alleges, as faults in the Newport, causing the collision, that the Newport did not slacken her speed and reverse her engine and wheels, when approaching the stern of, and overtaking, the Quickstep, when within a proper distance from her for that purpose, and in not exercising proper care, when the persons navigating the Newport had the Quickstep in full view. These faults are established by the evidence.

There is something very obscure in the account given by those on board of the Newport, of the occurrence. They make out, that, having the Quickstep on their port hand, and seeing her sheer to starboard across the course of the Newport, the Newport ported. This would be to follow up the Quickstep, and run into the peril which they claim the Quickstep was inviting. Still further, they claim that a hail was given from the Newport to the Quickstep, urging the Quickstep, when she was presenting in view her starboard side, crossing the bows of the Newport to the starboard, to quicken her speed, and go ahead across the bows of the Newport; and this, while the Newport herself was swinging to starboard, as they claim, on a port helm. All these appearances, and the hail to the Quickstep, are explicable and consistent, on the view, that the Newport, thinking, as her answer says, that the Quickstep was bound up the East river, was herself rounding gradually to port, to breast against the effect of the ebb tide on her port bow, and to head up the East river, and that she mistook this gradual rounding on her own part, for a sheer of the Quickstep to starboard, and then saw that a more rapid forward movement of the Quickstep would aid in causing the Newport to go clear to port under the stern of the Quickstep, and so gave the hail to the Quickstep to go ahead faster. If the Newport were in fact swinging to starboard on a port helm, with the Quickstep crossing ahead from port to starboard, a hail to the Quickstep to go ahead to starboard faster, seems quite out of place. The more natural hail would seem to have been, for the Quickstep to starboard and stop, and get out of the way to the port side, while the Newport was sheering to starboard on a port helm.

There must be a decree for the libellants, with costs, with a reference to compute the damages.

[NOTE. The owners of the barge towed by the Quickstep libeled the latter vessel for the damage suffered by them in the collision. The court held in this case, as in the one above, that the Quickstep was without blame. Libel dismissed. Case No. 8,909.]