THE PRUDENCE (two cases).

(District Court, E. D. Virginia. October 25, 1911.)

1. COLLISION (§ 94*)—OVERTAKING STEAM VESSELS—FAULT.

Conflicting evidence considered, and *held* to establish by a strong preponderance that, at the time of a collision on Elizabeth river in the daytime between a gasoline launch and a tug, the tug was overtaking the launch on a substantially parallel course, and was solely in fault for not only failing to avoid risk of collision, but for negligently running into the launch.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.*

Collision by overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

2. COLLISION (§ 122*)—SUIT FOR DAMAGES—EVIDENCE.

In a suit for a collision in the daytime, the failure of the libeled vessel to produce as a witness an officer who was in the pilot house at the time, or to give any reason for not so doing, is a circumstance which the court may properly consider when the testimony is conflicting.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 257, 258; Dec. Dig. § 122.*]

3. DEATH (§ 95*)—AMOUNT—WRONGFUL DEATH.

An award of $7,000 each made for the deaths of the captain and engineer of a launch, each earning about $900 per year; the former being 37 years old, with a wife and five children, and the latter 25 years old, with a wife and one child.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108–120; Dec. Dig. § 95.*]

In Admiralty. Suits by Rosa Lee Cherry, administratrix of Benjamin Luther Cherry, deceased, and by Lena E. Harper, administratrix of Lee Harper, deceased, against the steam tug Prudence. Decrees for libelants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

191 F.—63

Henry Bowden, for libelant Cherry.
E. R. F. Wells, for libelant Harper.
H. M. Long and Edward R. Baird, Jr., for respondent.

WADDILL, District Judge. On the morning of Friday, May 5, 1911, about 9:30 o'clock, the steam tug Prudence and the gasoline motor boat Clara Belle were in collision off the city of Portsmouth, in the Southern branch of the Elizabeth river, to the eastward of mid-channel, slightly below the training ship station at St. Helena, on the opposite or Berkley side. The Prudence was an ocean-going steam tug of about 250 horse power, 90 feet long and 20 feet beam, and the Clara Belle a gasoline motor boat of about 4½ tons, 35 feet long. The morning was clear, the weather good, and no obstruction to free navigation of the river. The vessels came together, the port bow of the Prudence apparently coming in contact with the starboard side of the launch abaft of amidship, capsizing the latter vessel, which resulted in the drowning of the master and engineer of the Clara Belle, for which loss of lives these two libels were filed, and by consent were heard together.

[1] The assignments of error made by the parties, respectively, one against the other, are numerous, though the case, as viewed by the court, turns almost entirely upon whether, at the time of the collision, the vessels were proceeding on parallel or crossing courses. Libelants contend they were on parallel courses; that the Prudence was the overtaking vessel, and as such required to keep out of the way of the launch, and charged with the duty of avoiding, not only a collision, but the risk of collision. Whereas the respondent insists that the vessels were proceeding on crossing courses; that, while the Prudence was heading down the Elizabeth river, the Clara Belle crossed ahead of the Prudence, on the latter's starboard bow, and after proceeding down the river a short distance, and when the Prudence had gotten within 200 feet of the Clara Belle, the latter vessel changed her course to starboard, again crossing the course of the Prudence. The evidence on the crucial points in the case is in direct conflict, and has to be viewed, and the difference solved, by the court in the light of all the circumstances surrounding the transaction, having due regard to the side on which the testimony preponderates.

The conclusion reached by the court is that the contention of the Prudence, that the vessels were navigating on crossing courses, is not supported by the testimony, and, on the contrary, is disproved; while that of the Clara Belle, as respects the course of navigation of the two vessels, at the time of the collision, is established by an overwhelming preponderance of the testimony. From the Clara Belle we have only one witness, an ignorant and inexperienced colored man; the other two persons on board, the master and the engineer, having been drowned. The testimony of this employé sustains the contention of the libelants. From the Prudence, her master, the engineer, assistant engineer, steward, and a deckhand were examined as witnesses; and while in the main they support the contention of the respondent, the master's evidence in most essential particulars is at utter variance

with his report of the occurrence and his sworn statement made to the local inspectors of steam vessels immediately after the accident, and their version of the accident cannot be accepted, in the light of the evidence for the libelants, who were exceedingly fortunate in being able to secure the testimony of a number of disinterested and intelligent witnesses, particularly as to seafaring matters, in full view of the scene of the accident, and sufficiently close thereto as to be able to give an accurate, and what the court believes to be a true, account of the collision, and the circumstances leading thereto.

Lieut. Stone, in charge of the United States training ship Franklin, was in the Franklin's launch, which was at the time proceeding up the river from the ferry slip at High street, Portsmouth, to the Franklin, stationed on the opposite side of the river in Berkley; Quartermaster B. A. Ledgerwood, of the United States navy, stationed in the quartermaster's office on the Franklin, on the port side, and charged with superintending the landing of vessels at the Franklin, was in full view of the occurrence from the Berkley side of the river; and sundry witnesses from the battleship Louisiana and on the barge made fast to and coaling the Louisiana, in the immediate vicinity of the scene of the collision, on the Portsmouth side of the river—one and all testified as to the circumstances of the collision, and the navigation of the vessels prior thereto. Commander Stone, Coxswain H. J. Weldon (who was at the wheel of the Franklin's launch), Paymaster's Clerk Thomas F. Nolan, together with Quartermaster Ledgerwood of the Franklin, above mentioned, Coxswain Wolverton of the Louisiana, Caulkins, a seaman on the Louisiana, and B. F. Hollingsworth, yeoman on the Louisiana, were examined by the libelants, and support each other in essential matters tending to establish libelants' claims, particularly that the two vessels were proceeding down the river on parallel, or practically parallel, courses, the Clara Belle preceding the Prudence, and the latter, coming at a more rapid rate of speed than the former, ran into and capsized her, with the result stated. Some of the witnesses referred to the vessels as racing; others, as observing the master and mate of the Prudence laughing, and apparently enjoying the race.

Respondent examined F. H. Kinney, a coxswain, also on the Louisiana, who saw the accident, and whose evidence largely supports that of the other witnesses introduced by the libelants; and there is but little testimony in the case, further than that of the conflicting statement of the master of the Prudence, and of the deckhand and assistant engineer on the Prudence, to support the claim of the tug that they were on crossing courses; and while the deckhand was in a position, perhaps, to see what he testified to seeing, the court doubts whether the same is true as to the assistant engineer, taking his own statement about the time he came from the engine room. Certain it is, their testimony cannot overcome that of the large number of disinterested witnesses above mentioned.

The respondent insists that the Prudence sounded one signal to the launch, indicating, as she now claims, that she would continue on her course as the privileged vessel, having the Clara Belle on her port

beam, and, upon receiving no answer, she at once rang four bells, and reversed her engine, which was in backward motion when the collision occurred. Libelants insist that, assuming the signal had been given, it was intended to indicate that the Prudence would pass the launch to starboard. Whatever may be the fact about the signal, it seems to have been given practically at the moment of the collision, and there is no testimony that the launch made any response, which the Prudence should have secured before proceeding on the maneuver she had inaugurated. The question, however, as to which vessel veered or changed her course, at the moment of the collision, as some of the witnesses testified, is, in the judgment of the court, not especially material, as mistake, under the circumstances, would be treated as error in extremis.

The testimony, as viewed by the court, establishes the case of the libelants clearly as one in which the Prudence was the overtaking vessel, and that it neither avoided the collision, nor risk of collision, with the Clara Belle, and, as a consequence, is solely responsible for the disaster. Having violated a plain rule of navigation, sufficient within itself to account for the disaster, and which caused the same, she cannot avoid responsibility by seeking to throw doubt upon the conduct of others.

[2] The failure of the Prudence either to produce the mate, who was in the pilot house at the time of the collision, or to account satisfactorily for not so doing, is a circumstance which the court cannot fail to observe, in reaching its conclusion. The Georgetown (D. C.) 135 Fed. 855. Criticism is also made, and not without force, of the failure of the respondent to tender its log for inspection. The Sicilian Prince (D. C.) 128 Fed. 133, 136. It is fair to say, however, in this connection, that the log was not called for, except in argument, and was then tendered.

[3] The conclusion reached leaves only for consideration the amount of damages to be allowed, which is always a matter of difficulty and delicacy to determine, resting, as it does, largely in the discretion of the court. Capt. Cherry was 37 years of age, with a wife and five children, whose ages range from 2 to 16 years; a man of good health, character, and habits, and who earned about $950 per year. Engineer Harper was 25 years of age, of like health, character, and habits, with a wife and one child, 2 years old, and who also supported his wife's aged mother and father. He earned about $900 per year.

Under the circumstances of this case, the court believes that, taking into account the difference in the ages of the deceased and those dependent upon them, respectively, an equal award should be made to the parties, and that the sum of $7,000 is a proper allowance in each case.