### THE JAMES W. FOLLETTE.
### THE I. L. I. 105.
### COYNE v. ERIE & ST. LAWRENCE CORPORATION.

District Court, S. D. New York.
Aug. 26, 1932.

Macklin, Brown, Lenahan & Speer (by J. Dudley Eggleston), of New York City, for libelant.

Stanley & Gidley (by Arthur E. Otten), of Buffalo, N. Y., for claimant.

GODDARD, District Judge.

This suit is brought by libelant, Ross Coyne, against the motorship I. L. I. 105 to recover damages alleged to have been sustained on November 6, 1928, at about 12:15 a. m. to the steam canal boat James W. Follette when it is alleged the suction of the I. L. I. 105 negligently caused a stone scow to come in contact with the Follette. The place where it occurred was on the New York State Barge Canal some 300 feet east of Bridge No. E–192 or about a mile west of Hulberton, N. Y. At this point the canal is approximately 75 feet wide and 10 to 12 feet deep. The north bank is of rock and nearly perpendicular, and the south bank is of dirt and somewhat inclined. At the time there was a strong current flowing easterly at the rate of one to two miles an hour.

The Follette is a steam canal boat 96 feet long and 17.6 feet wide. She was about three-quarters loaded and had in tow six barges; four of them were half-loaded and the other two were light. The Follette was pushing one barge and towing the remaining five, which were closely coupled in tandem on a hawser 350 feet long.

The No. 105 is a twin screw steamship 254 feet long and 36 feet beam, with a draft about 9 feet and 3 inches, and was equipped with 180 H. P. diesel engines. Both the Follette and the No. 105 were west bound.

Shortly before midnight of November 5th, as the No. 105 was overtaking the Follette and when two or three hundred feet astern of the last boat of the Follette's tow, the No. 105 blew a two-whistle passing signal to the Follette; her master believing that as they were nearing a bend in the canal it was not a good place for the steamer to attempt to pass, replied with an alarm signal. After rounding the bend, the No. 105 blew another two-whistle signal, to which the Follette replied with two whistles and pulled over close to the starboard bank so as to let the No. 105 pass on the Follette's port side. The Follette had slowed down to about one-half mile an hour, just enough to maintain steerage way; and the No. 105 proceeded to pass at the rate of about two miles an hour. While the No. 105 was passing the tow, the suction or interaction produced by the No. 105 caused the hawser to slacken and the forward barges to jump against each other and the tow to get out of shape, and the No. 105 put a line to the Coyne, the hawser boat, backed up, and finally got the boats in shape again. The No. 105 again proceeded to pass the tow. Soon after the captain of the Follette saw about 50 feet ahead of him a stone scow moored to the starboard bank. There was a lantern on the scow, but the light was not visible until he neared it, as it was hidden by a pile of stones 7 or 8 feet high on her deck. As soon as the scow was observed the captain of the Follette blew an alarm and the captain of the Coyne shouted to those on the steamer warning them of the barge. The stone scow was estimated to be 22 to 30 feet wide and 60 to 75 feet long. The Follette continued on slowly; her push boat had gotten beyond the scow and she had cleared it by some few feet and as the No. 105, which had kept on notwithstanding the alarm and warning, was passing the Follette, the stone scow was torn loose from her moorings by the suction and interaction produced by the No. 105 and rammed against the rudder and steering gear of the Follette putting her out of commission. The Follette came to a stop 50 to 75 feet beyond the scow and the No. 105 a short distance beyond her. Upon going back to investigate, it was found that a line from the lower end of the scow, about 100 feet long that had been made fast to an iron bar about 4 feet long and 1½ inches in circumference which had been driven into the ground, had pulled out so that although a line from the upper end of the scow which was made fast to a large derrick held, the scow was drawn along by the suction of the No. 105, as the boats in the

tow had been when the No. 105 passed by them, until it collided with the Follette.

The defense was set up in the answer that the Follette backed into the scow, and there was some testimony to that effect; but after hearing and seeing the witnesses, I am left with no doubt that this was not so. And I am quite convinced that when the captain of the Follette discovered the stone scow he felt that the safe thing was to get his entire tow past it before the No. 105 attempted to pass him and that with this in mind he blew the alarm signal and proceeded on.

There may be a question as to whether the scow was properly moored, although there was testimony that it was moored in a manner usual along the canal. But it seems to me that it was negligence for the No. 105 to have continued on in face of the alarm and warning and attempt to pass the Follette at this point. The canal was only 75 feet wide and the combined width of the No. 105, Follette, and scow was 65½ feet or 73½ feet, depending upon whether the scow was 22 feet or 30 feet wide as testified to. The captain of the No. 105 admitted that he passed within 6 feet of the scow and of the Follette. It is well known that the suction or interaction of the water produced by a vessel as large as the No. 105, 254 feet long and 36 feet beam with a draft of 9 feet and 3 inches, in a canal not more than 10 or 12 feet deep, is likely to cause serious trouble for smaller craft in her vicinity. With these three vessels abreast almost, all the water was excluded from the canal at that point, and as the two larger ones passed on the water rushing in to fill the vacant space would create a powerful draft, although they were not moving at a high rate of speed. For the No. 105 to have attempted to pass the Follette at that point and under those conditions seems to have been subjecting the Follette to danger, and as the Follette warned her against it, the risk was assumed by her and she should be held liable for the damage which followed.

In The Mesaba (D. C.) 111 F. 215, 223, Judge Brown said: "The Mesaba as an overtaking vessel was bound to keep out of the way of the Martello (article 24), and took whatever risks attended the attempt to pass where she did, whether arising from the narrowness of the channel, the shallowness of the water, suction, the tide, or any other causes except those arising from the fault of the Martello herself * * *." Northern Nav. Co. v. Minn. Atlantic Transit Co. (C. C. A.) 49 F.(2d) 203. See, also, The

Sif (D. C.) 181 F. 412; Atlas Transportation Co. v. Lee Line Steamers (C. C. A.) 235 F. 492; The Henry W. Oliver (D. C.) 202 F. 306.

Accordingly, libelant may have a decree with the usual reference as to amount of damage.