## JETT v. TEXAS CO.

## THE HANNAH A. LENNEN.

## THE BUENA VISTA.

### No. 1578.

District Court, D. Delaware.

Sept. 29, 1947.

James M. Tunnell, Jr., of Tunnell & Tunnell, all of Georgetown, Del., for libelant.

William Prickett, of Wilmington, Del., and Leon T. Seawell, of Hughes, Little & Seawell, all of Norfolk, Va., for respondent.

RODNEY, District Judge.

This cause in admiralty has for its setting the lower Delaware Bay opposite the town of Lewes, Delaware. Among other peculiarities of the case is the insistence of the respondent that its vessel, the Buena Vista, was not concerned in any accident or collision with the boat of the libelant and that there was no physical impact of the vessels, as the libel alleges. That a physical impact of the vessels was actually had must be held by me as a matter of fact, as hereinafter considered, and the determination of the cause of the collision is the principal object of this expression of views. This determination must be had by reconciling, as best I may, the divergent testimony of the witnesses which were heard, any conclusions to be drawn from the failure to produce material and available witnesses, and the probabilities arising from a consideration of these sources.

Early in the morning of June 16, 1944, the Buena Vista, owned and operated by the respondent company, was coming down the Delaware Bay and bound out to sea. She was a large iron or steel tanker approximately 504 feet long and 68 feet beam and without cargo at the time. The Buena Vista was in charge of an experienced and full-branched pilot. The Delaware Bay during the war conditions then existing had been planted with mines. Through this mine field there was a mine-swept channel of about 1,000 feet in width through which vessels could pass in safety after they had been reported to and approved by the Station Boat. This channel was marked by buoys—"A," "B" and "C," being lighted buoys on the eastern side, and "D," "E" and "F," being can buoys marking the western side of the clear channel. It was in this channel and bound for the open sea that the Buena Vista was proceeding on June 16, 1944. The time of the present controversy was between 3:30 and 4:00 o'clock in the morning. It was dark but otherwise clear and the sea was smooth, the tide being about flood, and there was no wind of consequence.

When the Buena Vista arrived at a point where the Station Boat was visible, those in authority on the Buena Vista saw the lights of another vessel near such Station Boat, which afterwards are assumed to have been the lights of the Hannah A. Lennen, belonging to the present libelant.

The Hannah A. Lennen was a wooden fishing steamer approximately 125 feet long and 22 feet beam, and was engaged in commercial fishing for menhaden in the nearby waters of the ocean. Concededly the Lennen left the vicinity of the Station Boat at the time in question and was bound out to sea to engage in fishing, and it is entirely clear that in order to reach the open sea by the mine-swept channel a general southeasterly course would have to be adopted soon after leaving the Station Boat. Almost northeasterly from the Station Boat were the two buoys, can buoy "F" marking the western side of the mine-swept channel, and buoy "C" marking the eastern side of the channel. Clearly the Lennen after leaving the Station Boat followed a northeasterly course seeking the location of the buoys "F" and "C" as a means of ascertaining the location of the channel through which the boat was supposed to pass. The watch on the Lennen was on the lookout for buoy "C" and had passed a buoy which for the purpose of this discussion may be assumed to have been buoy "F."

The libelant contends that the Lennen after leaving the Station Boat took a northeasterly course and that this course was not changed until after the accident. Such course would have placed the Lennen on the starboard or right side of the Buena Vista and, if the northeasterly course of the Lennen had been continued, it would have constituted what may be called a "crossing" case. The libelant contends that the pres-

ent was in fact a "crossing" case calling into play the following rules:

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."[1]

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."[2]

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."[3]

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."[4]

The respondent on the other hand contends that the facts of the case do not establish this as a "crossing" case but that at the time in question the Buena Vista was following the Lennen and, if the impact or collision did take place, it was because the Lennen wrongfully converged upon the Buena Vista; that it then being a "following" case and the Buena Vista having intended to pass the Lennen on the port side, the following rule applies:

"Rule VIII. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass * * * on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port. * * * The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."[5]

The respondent contends (1) that no physical impact or collision took place between the Buena Vista and the Lennen, and (2) that the Buena Vista, following the Lennen, gave two blasts of her whistle indicating the desire to pass on the port side and any accident was caused by the change of course of the Lennen to the left, and the consequent converging of the Lennen upon the Buena Vista.

As heretofore indicated I must find from the evidence that a collision did take place. It is true that a number of those on the Buena Vista denied any knowledge of the collision and expressed a disbelief in such fact. The pilot, the master and the mate of the Buena Vista all on the bridge at the time testified that no collision took place; that the Buena Vista was an iron vessel, riding light and only in ballast, and that any sound or collision would reverberate as in a drum; and it is in evidence that no mark of a collision of any kind was afterwards found upon the Buena Vista. It was also in evidence that the Buena Vista, under the then existing war conditions, was equipped with a special sounding device which would have given notice of any impact whatever. As opposed to this we have certain stark realities and direct and positive evidence of the collision. It is not disputed that the Lennen sank as a result of the water rushing in through a hole in her stern, and some reasonable explanation must be found for this reality. The positive evidence of the collision includes the following: C. F. Bernard, a watch on the flying bridge of the Buena Vista, states categorically there was a collision and states, "About the time the lights of the other vessel were disappearing under our bow I heard a shout from the other vessel and almost immediately I heard the noise of the collision as the two vessels came together. The noise sounded like noise I had heard at other times when the ship would be docking or when a tug would be scraping along side. When I heard the noise of the collision I also felt a jar where I was standing on the flying bridge. * * *" Taylor, a Navy man attached to the Buena Vista and being in the gun tub on the bow heard the noise of timbers breaking and men "hollering lifeboats." Pinnow, a Navy man

---

[1] 33 U.S.C.A. § 204; 6 Benedict Admiralty (6th Ed.) p. 401.

[2] 33 U.S.C.A. § 206; 6 Benedict Admiralty (6th Ed.) p. 401.

[3] 33 U.S.C.A. § 207; 6 Benedict Admiralty (6th Ed.) p. 401.

[4] 33 U.S.C.A. § 208; 6 Benedict Admiralty (6th Ed.) p. 401.

[5] 33 U.S.C.A. § 203; 6 Benedict Admiralty (6th Ed.) p. 400.

on the flying bridge of the Buena Vista, heard "the impact and saw the vessel sinking and drifting down our port side." Jones, the engineer of the Lennen, states that he saw the Buena Vista and that it struck the Lennen on the starboard side of the stern and that the engines of the Lennen were stopped by the inrushing waters. Lawson, on the Lennen, felt the impact and went to the stern and saw the ripped up boards.

In the absence of conclusive evidence of some other cause of the sinking of the Lennen I must conclude there was collision with the Buena Vista. It is in evidence that the mines herein mentioned were not contact mines but operated from locations on shore and there is no suggestion of other mines in the vicinity. I cannot adopt the mere suggestion in the brief of the respondent that the Lennen ran into a buoy and thus caused the injury. It is in evidence that the damage to the Lennen was a few feet starboard of the center of the stern and this location of the injury discourages at least the adoption of the buoy theory.

Assuming, then, that there was a collision between the vessels, the question of liability of the respective parties must involve the nature of the accident, viz., as to whether the accident was a "crossing" case on the one hand or an "overtaking" case on the other, for the rules of conduct are different in the two cases.

The libelant claims it was a "crossing" case and the respondent claims it was an "overtaking" case.

As in many admiralty cases, especially those originating in the blackness of the night, the testimony is in hopeless conflict. It is the duty of the court to find, if possible, some rational and reasonable state of facts which finds support in the evidence.

After the Lennen left the Station Boat she clearly adopted a general northeasterly course in the general direction of buoys "F" and "C." Lawson, a fisherman on the Lennen, was specifically on the lookout for these buoys marking the clear channel. Admittedly the Lennen was bound out to sea to engage in fishing and it is entirely clear that to accomplish this purpose she would have to adopt a south by southeast course on reaching the mineswept channel. The accident took place a short distance north from the buoys. The Buena Vista was in the channel and proceeding in a general south by southeast course, which was not changed until immediately before the accident. Did the Lennen at or near the mine-swept channel adopt a general southeasterly course? No person charged with the navigation of the Lennen appeared as a witness at the trial. It is true that several persons on the Buena Vista, including the pilot, testified they saw no change of course of the Lennen. On the other hand the captain of the Buena Vista, Ader, testified as to this change of course. The clearest testimony is that of the mate of the Buena Vista, Veeder. Veeder testified explicitly that he saw the Lennen when she was about five miles away; that the Lennen was then proceeding in a northeasterly course and the Buena Vista in a southeasterly course, and both were headed for the buoys (presumably buoys "C" and "F"); that the Lennen changed her course to starboard, rounded the buoy and proceeded down the channel ahead of the Buena Vista.

Evidence that the Lennen was ahead and the Buena Vista following is also found from those on the Lennen herself. Lawson, engineer of the Lennen, when asked when he first saw the Buena Vista, answered, "I will say she was a hundred yards behind." He then notified the captain of the Lennen and stated, "Well, I looked back again to make sure what it was and I told him it was a ship coming." When asked whether he looked back or forward, he answered, "I was looking back" and he then saw the Buena Vista about a hundred yards away as he computed it.

In addition definite conclusions may be drawn in connection with those in charge of the navigation of the Lennen. Walker, captain of the Lennen and on the bridge at the time did not appear at the trial although he was in the jurisdiction within a few days prior thereto and this fact must be adverted to at a later stage herein. However, soon after the accident a Coast Guard hearing was had concerning it and at this hearing Captain Walker

testified. It is in evidence before me that, at the hearing before the Coast Guard, Captain Walker testified that at the time of the accident he was following a course south by southeast; that Walker saw the Buena Vista nearly astern or, as the statement of Walker's testimony reads, "He [Walker] picked us [Buena Vista] up directly or approximately on his stern for some distance, whether it was a half a mile I just can't say the exact distance, whether he gave that or not but, whatever it was, it was astern."

When to the direct evidence that the Lennen shortly before the accident was proceeding on a course substantially the same as the Buena Vista (a general south by east or south by southeast) and preceding the latter vessel there is added the knowledge that this was the general course the Lennen would be required to pursue to reach her objective, the inference is strong that the accident happened when the vessels were in an "overhauling" or "following" position and not that of "crossing." This view is strengthened by the fact that the very place of contact on the Lennon (a few feet starboard of the middle of her stern) would make any other course difficult of explanation.

Walker, the captain of the Lennen, was not called as a witness at the trial. He was present within the jurisdiction a little over a week before the trial and in consultation with counsel for the libelant. His testimony at the trial would have been most material in at least four particulars: (1) the course of the Lennen some time before the accident; (2) the course of the Lennen at the exact time of the accident; (3) the giving of notice by the Buena Vista as to her desire to pass on the port side of the Lennen; and (4) the failure of the Lennen to give notice to the Buena Vista of her dissent, if any, to the passing by the Buena Vista at the particular time and place.

I must then consider briefly the failure to call Walker as a witness and any conclusions or presumptions arising from such failure.

■ There is a rule that where evidence which would be properly part of a case is in control of a party whose interest it would naturally be to produce it and, without explanation, he fails to do so, an inference may be drawn that such testimony would be unfavorable to such party. The rule has usually been termed an inference of fact rather than a presumption of law and has many applications and is accorded varying degrees of weight and value. Many authorities are collected in a copious note in Ann. Cas.1914A, 909. The Rule has been applied in admiralty. The Ville du Havre, 28 Fed. Cas. page 1190, No. 16,943; The Fred M. Laurence, D.C., 15 F. 635; The Prudence, D.C., 191 F. 993; The Georgetown, D. C., 135 F. 854, 859.

The only explanation of the failure to call Captain Walker as a witness was that his antic'pated testimony in this case would be in violent conflict with his former testimony before the Coast Guard and so subject him to the charge of having formally given false testimony. The truth or falsity of his former testimony was complete after the termination of the former hearing, and I cannot consider the present explanation of Walker's absence as satisfactory.

■ Believing, then, that the accident falls within the meaning of a "following" or "overtaking" case, it is necessary to consider the navigation burdens of such situation. I have already mentioned Rule VIII as relied upon by the respondent. This is not the only pertinent provision, but the following are also called to my attention:

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear. * * *"[6]

---

[6] 33 U.S.C.A. § 209; 6 Benedict Admiralty (6th Ed.) p. 401.

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." [7]

"Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." [8]

It is unnecessary in this case to give detailed consideration to the second paragraph of Article 24. That portion of the Article only deals with the establishment of a vessel as an "overtaking vessel" and so subject to the rules incident to that character. The respondent here not only admits its character as an "overtaking" vessel but such character is, indeed, its distinct claim.

■ The first paragraph of Article 24 is an important one. It states that "Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel." This clearly makes the Buena Vista, as the overtaking vessel, the burdened vessel and Lennen the favored one.

■ Considering Article 24, then, in connection with Rule VIII, we find the Buena Vista as the burdened vessel overtaking the Lennen and desiring to pass on the port side. Clearly the Buena Vista, from the evidence, gave the proper signals for such movement. It is equally clear from the evidence that no assent to the movement was obtained from the Lennen by the prescribed two answering blasts. In the absence of the assent it was clearly the duty of the Buena Vista to keep out of the way of the Lennen.

■■ The failure of an overtaken vessel to answer the signals for passing given by an overtaking vessel is not to be taken as an assent to such passing. The rule requires an affirmative consent and, inter alia, is intended to obviate the effect of a failure to hear the passing signal. The Newport, 18 Fed.

Cas. page 120, No. 10,185, 5 Ben. 231; Erwin v. Neversink Steamboat Co., 88 N.Y. 184; The Florence, D.C., 68 F. 940; The E. H. Coffin, 8 Fed.Cas. page 373, No. 4,310.

■ An overtaking vessel has the duty to procure assent to the passing movement and is in fault when injury happens by reason of the passing without the agreement of the vessel overtaken. The City of Baltimore, 4 Cir., 282 F. 490; The Socony No. 115, D.C., 58 F.2d 392; Northern Nav. Co. v. Minnesota Atlantic Transit Co., 8 Cir., 49 F.2d 203; Dalzell v. United States, D.C., 60 F.2d 1068.

■ The Buena Vista as an overtaking vessel was bound to keep out of the way of the Lennen (Article 24) and took whatever risks attended the attempt to pass except those arising from any fault of the Lennen, herself. The Mesaba, D.C., 111 F. 215, 233; The James W. Follette, D.C., 6 F.Supp. 27.

This then brings me to a consideration of the navigation of the Lennen after the Buena Vista became a following vessel.

The most intelligent view that I can take of the evidence discloses these facts. Both boats were bound for the open sea and to obtain this objective both were required to use the mine-swept channel. In order to arrive at the mine-swept channel both boats were headed in the general direction of the buoys "C" and "F"; the Lennen travelling in a general northeasterly course and the Buena Vista in a general southeasterly course, the two boats converging toward each other. The Lennen arriving at the buoy first changed her course to the starboard, rounded the buoy and proceeded in a general southeastern course ahead of the Buena Vista but converging somewhat on the course of such vessel. The Buena Vista when some distance astern of the Lennen gave two blasts indicating her desire to pass on the port side which signal was afterwards repeated. After a short interval the Buena Vista gave the danger signal, reversed her engine and turned sharply to the port. In the meantime the Lennen continued to converge, crossed the bow of the Buena Vista and the port bow of the Buena Vista struck the Lennen a few feet to the

---

[7] 33 U.S.C.A. § 212; 6 Benedict Admiralty (6th Ed.) p. 402.

[8] 33 U.S.C.A. § 221; 6 Benedict Admiralty (6th Ed.) p. 402.

starboard of the rudder post. The Lennen then passed down the port side of the Buena Vista and subsequently sank.

The accident does not seem to have been unavoidable. While the night was dark, yet, from the testimony, it appears that the lights of both vessels were, or should have been, visible. The Lennen at the beginning was on the starboard bow of the Buena Vista and was thus the privileged vessel. If the Lennen changed her course and became the overtaken boat, in a "following" case, the Buena Vista was still the burdened vessel and was such in either situation.

As such burdened vessel the Buena Vista assumed whatever risks attended the attempt to pass except those risks which arose from any wrongful act of the Lennen, herself.

On the other hand the Lennen was clearly in a situation to know the position of the Buena Vista and of its intentions in passing and she did know or should have known of such position and intentions. I am bound to assume that lights were showing on the Buena Vista and that signals were given by that vessel. The vessel was in charge of an experienced and competent pilot who, with the master of the vessel and the mate, were all on the bridge and have so testified. Signals were given when the two vessels were in close proximity. The signals of the Buena Vista seem not to have been heard or the lights to have been seen by anyone on the Lennen until immediately before the accident. A fundamental rule of admiralty is that a lookout must be kept on all vessels so that a collision may be prevented even with those vessels which are violating the rules of navigation. Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, 2 Cir., 238 F. 560.

■ Even though a vessel be a privileged vessel under one rule, yet it may also be at fault for not keeping a proper lookout under Article 29. The J. W. Wonson, 2 Cir., 239 F. 857.

■ To constitute a compliance with the requirements of law, the lookouts must be persons of suitable experience, properly stationed on the vessel and actually and vigilantly employed in the performance of that duty; and for a failure in either of these particulars the vessel and her owners may be responsible. The Ogdensburgh, 62 U.S. 548, 21 How. 548, 16 L.Ed. 211; The Colorado, 91 U.S. 692, 699, 23 L.Ed. 379.

The Lennen, a commercial fishing boat, carried a fishing crew and certain persons having to do with the operation of the vessel. Lawson, described as "mate of the nets," had been asked to look out for the buoys. His location was somewhat indefinite except that he seems to have been in or near the pilot house. The only other person answering to any description of a lookout was one Frank Henderson, a young colored man and on his first trip and who, at the time, was sitting down in the pilot house.

■ As said in The New York, 175 U. S. 187, 20 S.Ct. 67, 44 L.Ed. 126, an unexplained failure to see or to hear what should have been seen or heard is evidence of a defective lookout. The force of presumption of a defective lookout on the Lennen is strengthened by two facts: (1) The lookout himself was a young man on his first trip and who was sitting down in the pilot house, and (2) the captain of the Lennen, on duty at the time, and available as a witness at the trial, was not produced to give any explanation as to why the lights of the Buena Vista were not seen or her signals heard.

The converging of the Lennen toward the Buena Vista and its movement or sheer to port instead of to starboard was a material element in the accident and this converging movement was the fault of the Lennen. It is the duty of an overtaken vessel to keep her course and, as Rule VIII states, "The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

■ While it cannot be said to be the duty of an overtaken vessel to maintain a lookout on the stern, yet no vessel should radically change her course without having made some observation that her change of course will not materially and injuriously affect another vessel that she knows or should have known was following in her wake.

■ I am of the opinion that the Buena Vista, as an overtaking and burdened vessel, was at fault for not maintaining a sufficient

distance between it and the Lennen and for undertaking to pass the Lennen without receiving an affirmative assent to the passing or other answer to her signals.

I am of the opinion that the Lennen was at fault for maintaining an inefficient lookout who failed to see and to hear what should have been seen and heard, and for radically changing her course to port and crowding the Buena Vista on her course.

The damages must be divided and, if the parties cannot agree, must otherwise be ascertained.