## THE CITY OF MACON.

BEDOUIN STEAM NAV. Co., Limited, *v.* THE CITY OF MACON *et al.*

*(Circuit Court of Appeals, Fifth Circuit.* June 23, 1892.)

### No. 35.

1. COLLISION—STEAMERS—OVERTAKING VESSEL—SAVANNAH RIVER.
    The large steamship Nedjed left her berth at Savannah, on the south side of the Savannah river, with the assistance of a tug, and started down the river. It was flood tide. She drew 19½ feet, had a list to starboard, was "smelling the bottom," and steered badly. In pulling from the wharf she took an angle across the chan-

nel. The tug was at once changed to her starboard bow, but before she could be straightened in the channel the large steamer Macon, then 300 or 400 yards astern, signaled that she would pass to port. The Nedjed replied with three blasts, which were mistaken by the officers of the Macon for two blasts, signifying, "All right; come ahead,"—and her engines were put full speed ahead. The officers of the Nedjed waved their hats, and called to the Macon that she must keep astern, but their signals were not understood. When about 100 feet away, "a little to the north and a little astern," the officers of the Macon noticed the Nedjed sheer to port, and stopped their engines, and put their helm hard astarboard, but did not reverse, thinking there was still room to pass; but, seeing her still continue to sheer, they then reversed at full speed, but too late to avoid collision. The river here is narrow, and the speed of the Macon exceeded that prescribed by the ordinances of Savannah. *Held* that, as the Nedjed was liable to sudden sheers under the circumstances, she was not responsible, and that the Macon was solely in fault, because of her excessive speed and disregard of the rule that an overtaking vessel must keep out of the way. 47 Fed. Rep. 919, reversed.

**2. SAME.**

The Nedjed had a right to act on the exigency of the tide and her own draft, which made it imperative on her to reach Tybee Knoll at high water, in order to pass to sea on that tide, and was not bound to remain at her berth, or to anchor or remoor, until the Macon passed.

Appeal from the United States District Court for the Southern District of Georgia.

In Admiralty. Libel by the Bedouin Steam Navigation Company, Limited, against the steamship City of Macon, (the New England & Savannah Steamship Company, claimant,) for collision with the steamship Nedjed. The district court held that the Nedjed alone was in fault, and dismissed the libel. 47 Fed. Rep. 919. Her owner appeals. Reversed.

*Wm. R. Leakin* and *Walter G. Charlton,* for appellant.

*Alex. R. Lawton,* for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

McCORMICK, Circuit Judge. On the 18th of October, 1890, about 9:10 A. M., the steamship Nedjed started on her voyage to Liverpool, Eng., from her dock at or near the Gordon wharf in the city of Savannah. She had on board a duly-licensed pilot. She had ahead of her a steam tug, to aid her in getting out into the stream of the Savannah river, and in her passage down its channel. She had a full cargo, and was drawing 19 feet 6 inches. About the same time that the Nedjed left her dock, the City of Macon left her slip at the Central Railroad wharf, about a mile higher up the river, and started on her voyage to Boston. A few minutes thereafter, (the exact number cannot be determined from the proof,) the City of Macon attempted to pass the Nedjed, and the ships collided, causing the Nedjed serious injury, and damage to herself and cargo. The appellant, the owner of the Nedjed, exhibited its libel against the City of Macon in the district court for the southern district of Georgia, charging that the collision resulted from the fault of the City of Macon, and without fault on the part of the Nedjed, and alleging and praying judgment for damages to a very large amount. The owner of the Macon put in its claim, in due time, and stipulation to pay the decree in the usual form, and in the sum of $160,-000, and, defending the libel, alleged that the Macon was not at fault, but that the collision was caused by the fault of the Nedjed. A vast

volume of proof was taken, and the case came to trial in said district court, and on the 19th of October, 1891, the judge had filed in the clerk's office his written decision, announcing that the libel should be dismissed at the cost of the libelant. And on the 21st of November a decree was passed, in accordance with said decision, from which the libelant appealed.

The errors assigned are:

"(1) That the said court erred in deciding that the said Bedouin Steam Navigation Company, Limited, was not entitled to recover against the said steamship City of Macon, her tackle, etc., and the said New England and Savannah Steamship Company, claimant. (2) That the said court erred in dismissing the libel filed by the said Bedouin Steam Navigation Company, Limited, in said cause."

There can be no contention as to the law and regulations for navigating ships in the circumstances attending these two ships immediately before the collision. "Every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. Every vessel overtaking any other vessel shall keep out of the way of the last-mentioned vessel,"—Rules 21, 22, § 4233, Rev. St.,—which is thus stated in the later act of 1885: "Notwithstanding anything contained in any preceding article, every ship, whether a sailing ship or a steamship, overtaking another, shall keep out of the way of the overtaken ship." Act March 3, 1885. "When steamers are running in the same direction, and the pilot of the steamer which is astern shall desire to pass on the right or starboard hand of the steamer ahead, he shall give one short blast of the steam whistle as a signal of such desire and intention, and shall put his helm to port; and the pilot of the steamer ahead shall answer by the same signal, or, if he prefer to keep on his course, he shall give two short and distinct blasts of the steam whistle, and the boat wishing to pass must govern herself accordingly, but the boat ahead shall in no case attempt to cross her bow, or crowd upon her course. When steamers are navigating in a crowded channel, or in the vicinity of wharves, they must be run and managed with great caution." Rule of Sup. Inspectors, p. 55. "In narrow channels every steamship shall, when it is safe and practicable, keep to that side of the fair way or mid-channel which lies on the starboard side of such ship." Act March 3, 1885, (23 St. at Large, p. 442.)

The respective pilots of these ships were well acquainted with the terms and force of these navigation laws, which all reported cases involving these questions strongly emphasize. The only question, therefore, to be settled is, how were these undisputed rules observed in this case? The district judge in effect found that they were fully observed by the City of Macon, and that she was not at fault. On appeal in admiralty, the court will not reverse the decision of the district judge, on a question of fact, depending on conflicting evidence, unless it clearly appears to be against the weight of evidence. *The Parthian*, 48 Fed. Rep. 564; *Levy v. The Melville*, 37 Fed. Rep. 272; *Guimarais' Appeal*, 28 Fed. Rep. 528. In this case it does clearly appear to us that the

decision of the district judge on the disputed questions of fact is against the weight of the evidence. Indeed, it appears to us that there is very little substantial conflict of testimony in the case. There is some apparent conflict, but it is almost wholly either the difference between positive and negative testimony, such as "I heard," and "I did not hear," or it relates to the mere matter of opinion as to the depth, width, and course of the channel at different points, and as to the speed of the City of Macon, all of which can be ascertained with reasonable certainty from other undisputed evidence in the case. The vessels were both large ships. The Nedjed was 320 feet in length, and 40 or 45 feet beam. She was then drawing 19 feet 6 inches aft. The City of Macon was only a few feet shorter, her beam being 40 feet, and she was then drawing 18 feet and 1 inch aft. Judging from their own testimony, and from all the other evidence in the case, the officers in charge of these boats were men of skill and character. Their testimony appears to be entitled to full credit; and the weight of their testimony is to be determined by a comparison of their respective situations at the time of the collision, and by a comparison of what they affirm, with other established facts and credible testimony.

Before starting, the Nedjed was at her berth at the wharf, on the right bank of the river, with her bow down the stream. The tug first pulled on her port, to draw her into the stream, and away from the wharf. As soon as she was sufficiently clear of the piers for her propeller to revolve, her engines were started slow ahead, with her helm hard aport, and the tug was carried over to the starboard bow. The tide was flood, about two thirds full, an hour and a half or two hours before high water. The current acted to force her bow to port, or to resist her responding to her helm, and the force of the tug to bring her bow to starboard, and straighten her in the channel. She had a list to starboard. She was smelling the bottom, and steering badly. In pulling out from the wharf, she took an angle across the channel, a point or two towards the north shore, and had not succeeded in getting properly straightened in the channel, when the City of Macon, then 300 or 400 yards astern, (her captain says "1,100 feet, or such a matter,") signaled with two sharp blasts of her whistle, which both parties understood to mean, "I am going to pass to your port." The pilot in charge of the Nedjed ordered her captain to give three blasts of her whistle in reply. This Capt. Newey himself immediately did; but for some reason Capt. Lewis, who was acting pilot as well as captain of the Macon, mistook this reply for two distinct blasts of the whistle, signifying, "All right; come ahead." The pilot in charge of the Nedjed, observing that the City of Macon was still coming on, waved his hat, and shouted, "You must keep astern until I get around the bend," which, appearing not to have been understood by the officer of the Macon, was repeated by the captain of the Nedjed, "The pilot says you must keep astern until we get around the bend." The ships were then very near together. The pilot and captain of the Nedjed were only about 250 feet from the captain of the Macon at the time the captain of the Macon heard the hallooing, but

neither he nor his mate could distinguish what was said, and neither paid any attention to what was being said, "because at that time they were going full speed astern on the Macon, and handling her according to the rules." The hour, the weather, the lay of the river, and the conditions of the port were such that the captain of the Macon could have seen the Nedjed from the point and time of his starting; but the navigation of his ship along the city front, and by other vessels, engaged his attention, and he did not observe her until he was abreast the wharf of the Baltimore Line, and some 300 feet above the point from which he signaled.

An ordinance of the city of Savannah limits the speed of steam vessels along the city front to four miles an hour. The whole way from the Central Railroad wharf, the Macon's starting point, to "near the Fig Island light," where the collision occurred, is along the city front. The channel near the Fig Island light is a narrow channel for ships of that size to pass while both are under way, and going the same way. Just below this point is the "new cut," the narrowest part of the channel, and to enter which, with so large a ship as the Nedjed, required that she should steer near the north line, or port side, of the channel just before entering. The time and distance covered by the Macon from her starting to the collision, the entries in her log, the evidence of her engineer in charge of her power, show that her speed was more than four miles an hour when her captain first observed the Nedjed. It is conceded that when he received the Nedjed's reply to his signal the Macon was then put full speed ahead, to enable him to run by the overtaken steamer under way. When the Macon was about 100 feet from the Nedjed, "just a little to the stern and a little to the north side," the Macon's officers noticed the Nedjed sheer to port, and stopped the Macon's engine, and put her helm hard astarboard, but did not reverse, thinking there was room enough at that time; but when they saw her continue to sheer, they then reversed the Macon's engines at full speed, but she was then too near, and her headway too great, to avoid the collision. There were two collisions before the Macon consented to remain astern until a point was reached where it was safe for her to pass. It is unnecessary to pursue this statement through the details of the first and second collisions. After the second collision, the Macon kept astern until the ships reached Venus point, some distance below, when the Nedjed stopped for a survey, and the Macon passed to sea on that tide. Some of the plates of the Nedjed were cracked or burst, so as to cause her to take water freely, the injuries extending to within four feet of her bottom.

The testimony of the pilot, Fleetwood, and of Capt. Newey is so well supported by the circumstances of the situation, as shown by all the proof, that we are constrained to conclude that the Nedjed was a well-constructed, well-equipped, and well officered and manned steamship for ocean service; that she was maneuvered to the best advantage reasonably practicable in that channel, with her burden; that she was not maneuvered to cross the bow or crowd upon the course of the Macon, but was using the best endeavors of skillful officers, with adequate machinery and ap-

pliances, with the aid of the steam tug Cynthia, to get herself straight in the channel; that her draft was such that she had barely water sufficient to float her; that she was taking or smelling the bottom, and thus liable to take a sudden and incalculable sheer; that she was a large vessel with a keel, which, while it made her better for keeping a direct course, made her slower in obeying her helm; that in about 10 minutes from the time she left her wharf, and before she had gotten properly straightened in the channel, the Macon was on her in the manner already detailed. The tone of the testimony of the officers of the Macon indicates that their judgment received a strong bias from a suggestion which appears to have been present in their minds, and to have since affected the views of the learned proctor for the claimants, to the effect that the British tramp had no right to act on the exigency of the tide, and of her own draft, which made it imperative on her to reach Tybee Knoll at high water, if she would pass to sea on that tide, but was bound to either remain at her berth until the Boston packet passed, or to remoor or anchor out of the way (if she had been given time) when she received the Macon's signal. From the view we take of the proof, it is clear that the Macon violated all the rules applicable to the situation; that the collisions were the direct result of her unlawful conduct; that this result was not contributed to by any culpable defect in the Nedjed, or fault in her management; and that the decree of the district court should be reversed, and this cause remanded to said court, with direction to enter a decree in favor of the libelant, with a reference to a commissioner to find and report the damages; and it is so ordered.