fact that Emerson paid on the 1st of each month, for some months previous to his default for the months of May and June, does not change the obligation of one of the contracting parties toward the other. Their rights and obligations were fixed by the contract of insurance, and not by their practice of payment.

For these reasons, I think the judgment below should be reversed, and I dissent from the judgment about to be rendered.

=====

## THE ROBERT FULTON.

## THE SALTHAVEN.

(Circuit Court of Appeals, Second Circuit. January 15, 1926.)

Nos. 162, 163.

1. **Collision ⊚⟹94—Failure of steamer to slow before passing motorboat held gross negligence.**

Failure, of sidewheel steamer 346 feet long, 42-foot beam, drawing 7 feet, to slow when passing, in ,Hudson river, motorboat 85 feet long, 13.6-feet beam, and drawing 3½ feet, *held* gross negligence.

2. **Collision ⊚⟹94—Steamer passing motorboat bound to keep out of way.**

Under Inland Rules June 7, 1897, art. 18, rule 8, and articles 21, 24 (Comp. St. §§ 7892, 7895, 7898), steamer passing motorboat is bound to keep out of the way, and motorboat may keep her course and speed.

3. **Evidence ⊚⟹8—That suction of overtaking vessel is frequent cause of collision is well known.**

That suction of an overtaking vessel is a frequent cause of collision, especially if she is larger than overtaken vessel and channel is narrow, *is well known.*

4. **Collision ⊚⟹94—Steamship held to have been passing light motor yacht at excessive speed.**

Steamship in Hudson river *held* to have been passing a light motor yacht at excessive rate of speed, so that displacement waves caused collision.

Appeals from the District Court of the United States for the Southern District of New York.

Libel by Warren S. M. Mead against the steamer Robert Fulton, her engines, etc., the Hudson River Day Line, claimant with cross libel by the Hudson River Day Line against the yacht Salthaven, her engines, etc., Warren S. M. Mead, claimant. From a final decree for libelant Mead, and from a decree dismissing its cross-libel, the Hudson River Day Line appeals. Decrees affirmed.

The following is the opinion of Ward, Circuit Judge, in the court below:

"September 27, 1920, a little after 11 a. m., the twin screw motorboat Salthaven came into collision with the sidewheel steamer Robert Fulton at a point in the Hudson river between the black buoy on the westerly edge of the channel near the lower end of Coxsackie Island and Nutten Hook on the east side of the channel. At this buoy there is a width of navigable water of about 1,000 feet, and at Nutten Hook a width of from 700 to 800 feet.

"The Salthaven is 85 feet long, 13.6 feet beam, and draws 3½ feet of water. The Robert Fulton is 346 feet long, 42 feet beam, and draws 7 feet. The tide was negligible, being about slack water ebb or the beginning of flood. The Robert Fulton was running at a speed of not less than 12 miles an hour, overtaking the Salthaven, which was running at from 9 to 10 miles an hour, and when about 1,000 to 1,200 feet astern the Robert Fulton blew a signal of two blasts, which the Salthaven answered with a signal of two blasts. The claimant admits that the Salthaven was then running along the west side of the channel. All its witnesses—Mayer, the master; Reitnauer, second pilot, at the wheel; and Briggs, first pilot—say that the Robert Fulton slowed when the vessels were not quite lapped, and Brodt, the chief engineer, says that he heard a bell to slow, and immediately after one to stop. All the witnesses estimate that the space between the courses of the vessels was about 100 feet.

"The Robert Fulton passed the Salthaven without the slightest apprehension of danger, and no one of her officers or crew knew that a collision had happened, except the mate. He was standing aft of the pilot house on the port side, and, seeing the passengers running to look over the starboard side, ran there himself, and saw that the bow of the Salthaven had struck the starboard quarter of the Robert Fulton. Then he ran into the pilot house and told the officers, whereupon the Robert Fulton stopped and backed to the icehouse dock on Nutten Hook.

"The pleadings of the Robert Fulton say that the Salthaven went from the eastward to the west side of the channel at a point higher up, and that the Robert Fulton then blew the two blasts and slowed; the Salthaven answered two, and, maintaining her course, crowded the Robert Fulton to the eastern bank. If the Salthaven was proceeding down the west side, it is not easy to see how she crowded the Robert Fulton to the

east side, nor why the Robert Fulton in that situation did not appreciate the danger and take precautions to prevent collision.

"The deck log of the Robert Fulton shows that she slowed about 3 minutes before passing tows 1,200 yards away, which would indicate a speed of 12 nautical miles an hour. The first tow she passed was at Stuyvesant, about 2 miles north of the place of this collision, in about the same width of channel. It seems to me that her displacement waves would have much more effect on a little skimming dish like the Salthaven than they would on ordinary tows. See The Robert Fulton, 187 F. 107, 109 C. C. A. 27.

"The witnesses for the Salthaven place the collision on the west side of the channel, and the witnesses for the Robert Fulton place it on the east side. The former say the waves hit the port quarter of the Salthaven at an angle of 45 degrees, and listed her over to starboard and her bow to port.

"I attach great weight to the testimony of Turner, captain of the Coxsackie ferryboat, which was leaving her slip on the Coxsackie side. He says he saw the Robert Fulton overtaking the Salthaven, and felt that, if she did not slow, the Salthaven would certainly be swamped. For that reason he, after crossing the bows of the Salthaven and the Robert Fulton, instead of going into his slip at Nutten Hook, starboarded and went up north, so as to render assistance, if any were needed. He also says the Robert Fulton did not slow or stop till she got to the icehouse dock at Nutten Hook. He did not see the collision, evidently because the Robert Fulton was between him and the Salthaven. After the collision, he saw the Salthaven going into the icehouse dock, which appears to have been the nearest place of refuge. He then went into his slip.

[1] "I think the failure of the Robert Fulton to slow when the signal of two blasts was exchanged was gross negligence. The Salthaven tried to go off to starboard, by backing on her starboard engine and putting her helm hard aport, but without success.

[2] "The claimant examined one Pell as an expert navigator, who expressed the opinion that the Salthaven should have anticipated the danger of suction, slowed her engines, and put her head to starboard. But the Robert Fulton, as the overtaking vessel, was bound under the Inland Rules of June 7, 1897, to keep out of the way and the Salthaven to keep her course and speed.

"Article 18, rule VIII, provides: 'When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel.' Comp. St. § 7892.

"Article 21 provides: 'Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed.' Comp. St. § 7895.

"Article 24 provides: 'Notwithstanding anything contained in these rules, every vessel, overtaking any other, shall keep out of the way of the overtaken vessel. * * * ' Comp. St. § 7898.

[3] "That the suction of an overtaking vessel is a frequent cause of collision, especially if she is larger than the overtaken vessel and the channel is narrow and shallow, is well known. The City of Brockton (D. C.) 37 F. 897; The City of Cleveland (D. C.) 56 F. 729. In this case, Judge (afterwards Mr. Justice) Brown, said: 'The testimony given yesterday, and the experience of my brethren here, lead me to believe that the suction of two vessels passing each other is not very powerful. It is too short to have any particular effect upon the action of the two vessels, unless one is much larger than the other; whereas, if they are going in the same direction, and passing near each other, it has a very powerful effect to deflect the weaker vessel from her course.' See, also, the Aureole, 113 F. 224, 230, 51 C. C. A. 181; The North Star (D. C.) 132 F. 145; The Henry W. Oliver (D. C.) 202 F. 306.

"The witnesses in the pilot house of the Robert Fulton say that at about the black buoy near the lower end of Coxsackie Island the Salthaven began to head over to the east

and diagrams are drawn to indicate this change of course. No such thing is stated in the answer. I do not believe the Salthaven would have done so senseless a thing, or that if she had, the Robert Fulton would not have immediately blow alarm signals, slowed, and stopped. On the contrary, she continued her course without the least anticipation of danger, as all her witnesses say.

[4] "I am convinced that the Robert Fulton was passing the light motor yacht at an excessive rate of speed. When her displacement waves reached the port quarter of the Salthaven, I think they would throw her over to starboard with her bow to port, and, as her bow got abreast of the Robert Fulton's starboard quarter, the suction would carry them into collision, exactly as happened.

"It is noticeable that no entry whatever was made of this collision, either in the deck log or the engine room log of the Robert Fulton. The libelant may take the usual interlocutory decree."

Bigham, Englar & Jones, of New York City (T. Catesby Jones, of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Eugene Underwood, Jr., and Chauncey I. Clark, both of New York City, of counsel), for appellees.

Before HOUGH, MANTON, and HAND, Circuit Judges.

PER CURIAM. Decrees affirmed, on opinion of Ward, Circuit Judge, below.

---

**WENTZ et al. v. SCOTT, Superintendent of Banks.**

(Circuit Court of Appeals, Sixth Circuit. February 5, 1926.)

No. 4486.

1. **Corporations** &=318—Common directors and managers occupy fiduciary relation toward both corporations, and contracts between them will be carefully scrutinized.

Common directors and managers occupy fiduciary relation toward both corporations, and contracts between them will be carefully scrutinized, and where there is an apparent unfairness in contract, burden rests on one obtaining such apparent unfair action to show his good faith and propriety of his action.

2. **Evidence** &=73—There is no presumption that common director or manager will deal unfairly with either corporation.

There is no presumption that common director or manager will deal unfairly with either corporation.

3. **Receivers** &=150—Consideration for notes to bank, given by corporation having common management, held shown by evidence showing credit was given for each note discounted.

Under Ohio Negotiable Instruments Act (Gen. Code Ohio, §§ 8129, 8133), consideration for note given bank by corporation having common management held shown by evidence in farm company's receivership proceeding, showing that, in each case where note of corporation was discounted, credit was given by bank, in absence of evidence showing no consideration or defect in notes.

4. **Corporations** &=401—Notes given by corporation to bank having same management do not place burden on holder, as in case of note of corporation made by president payable to himself.

Rule that negotiable note of corporation, made by president payable to himself, is prima facie void as to such corporation, placing burden on holder, has no application to note given by corporation to bank having same management.

Appeal from the District Court of the United States for the Southern District of Ohio; Smith Hickenlooper, Judge.

In the matter of the receivership of the Houston Farm Company. From an order of the District Court, allowing a claim in favor of H. E. Scott, Superintendent of Banks in and for the State of Ohio, Mary Wentz and others, creditors of the Houston Farm Company appeal. Affirmed.

John B. McGrew, of Springfield, Ohio (McGrew & Laybourne, of Springfield, Ohio, on the brief), for appellant Citizens' Trust & Savings Bank.

James G. Johnson and Chase Stewart, both of Springfield, Ohio (Horace L. Smith, of Xenia, Ohio, and P. R. Emery, of London, Ohio, on the brief), for other appellants.

Wilbur E. Benoy, Sp. Asst. Atty. Gen., of Ohio (C. C. Crabbe, Atty. Gen., and Frank A. Hunter, of Columbus, Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This appeal is from an order of the District Court allowing a claim against the Houston Farm Company, insolvent, in favor of the superintendent of banks of the state of Ohio, in charge of and in process of liquidating the Houston Bank. The claim in question and the controversy thereover arise out of this situation:

The Houston Farm Company was incorporated under the laws of Ohio in 1908. Its purpose was the acquiring, holding, leasing, managing, renting, selling, and otherwise dealing in farm property, real and personal,