**NORTHERN NAV. CO. v. MINNESOTA ATLANTIC TRANSIT CO.**

No. 8904.

Circuit Court of Appeals, Eighth Circuit.

April 3, 1931.

of 9 feet forward and 18 feet aft, backed out of slip No. 1, about 600 feet east of slip No. 3, and started for the same ship canal. This ship canal was 300 feet wide, 22.9 feet deep, and about 1,400 feet long, connecting the Duluth Harbor with Lake Superior. There were cement retaining walls on each side of the canal. At the west end of this canal the cement retaining walls continued as piers, but curved to the north and south to form an approach to the canal, and the width of the entrance at the extreme west end of the piers was some 500 feet. On the west end of the cement retaining walls and just before the walls continued as piers, or curved for the entrance, is an aerial bridge. At the time the boats arrived at this aerial bridge, the stem of the Noronic was ahead of the stem of the King; the latter lapping the port quarter of the Noronic some 75 to 100 feet. After the two boats had just passed the aerial bridge, their sterns were abreast, and the suction from the Noronic pulled the stern of the King towards the stern of the Noronic and caused the King to veer into the cement wall on its left or port side, inflicting considerable damage. The foregoing facts are the only facts in the record upon which there is no dispute. As to which steamer was in the lead after they had straightened out for the canal and as to the relative positions of the two vessels between that time and their arrival at the aerial bridge in the canal, there is an irreconcilable conflict in the evidence, or an entire lack of evidence.

Both vessels backed out of their respective slips, and in maneuvering backed to port, and each laid their respective courses for the ship canal. From the evidence they were in general traveling at about the same speed. The story as told by the witnesses for the Noronic is substantially as follows: That, as the Noronic was backing out of its slip, the King was observed backing out of its slip some 600 feet further west; that, as the Noronic straightened out and laid its course for the canal entrance, the King was finishing a like maneuver and was astern and to the starboard of the Noronic, later crossing the stern of the Noronic to port and at all times until entering the canal proper was astern of the Noronic; that at about the time they entered the pierheads of the canal the King endeavored to pass the Noronic, resulting in the positions of the two vessels as above recited and the subsequent damage to the King.

The story on behalf of the King, in substance, is: That the King had backed out of

H. A. Carmichael, of Duluth, Minn. (Oscar Mitchell, James G. Nye, and Mitchell, Gillette & Carmichael, all of Duluth, Minn., on the brief), for appellant.

Theodore C. Robinson, of Cleveland, Ohio (Roger W. Spencer, of Duluth, Minn., L. C. Hinslea, of Cleveland, Ohio, Spencer & Spencer, of Duluth, Minn., and Holding, Duncan & Leckie, of Cleveland, Ohio, on the brief), for appellee.

Before STONE and BOOTH, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

On a bright summer afternoon in August the steamer King, a salt water type blunt-bowed freighter, 251 feet long, 43.5 feet beam, and with a draft of 16.5 feet forward and 17.5 feet aft, backed out of slip No. 3 on the north shore of the harbor at Duluth, Minn., and headed for the Duluth ship canal about 3,000 feet to the east. At about the same time the steamer Noronic, a fine-lined passenger boat, 385 feet long, with a draft

its slip and was proceeding towards the canal going forward when the Noronic gave notice by a whistle that it was about to back out of its slip; the King then gave one short whistle indicating that it would pass to starboard of the Noronic and for the Noronic to remain in its berth; this signal was not answered by the Noronic, which at once proceeded to back out into the harbor, whereupon the King was required to stop its engines and wait while the Noronic backed across its bow, and that, as soon as the stem of the Noronic had cleared, the King proceeded, passing the Noronic on the latter's port side while it was maneuvering to straighten out for the canal, and the King was in front of the Noronic at all times thereafter until just as it was reaching the pierheads of the canal the Noronic, coming up fast from behind, endeavored to pass it, resulting in the position of the vessels and the subsequent damage to the King as above narrated.

The Minnesota Atlantic Transit Company was the charterer of the King, and as libelant brought this action against the Noronic, owned by the Northern Navigation Company. The trial court found that the damage caused to the libelant's steamer King was occasioned solely by the negligence of the respondent's steamer Noronic and without any fault on the part of the said King, and rendered judgment in favor of the libelant for the entire damage sustained by the King.

As both vessels were outward bound and each started on its course at about the same time, the stage was all set for a controversy to arise as to which one was entitled to go through the canal first. Evidence on behalf of the King was directed principally to the question of which one had the lead after the two vessels straightened out and fixed their courses for the canal, while the evidence for the Noronic was principally directed to the question of which vessel arrived first at the canal piers.

Three disinterested witnesses were standing on or near the dock from which the Noronic departed. Mr. Bronson, an officer in the United States Customs Service, was on the dock at the east side of the warehouse and about 50 feet inshore from the end of this dock. When the Noronic backed to the west he lost sight of it on account of the warehouse, and shortly thereafter saw the King go by, followed by the Noronic, which was about two ship lengths astern of the King. Practically the same story is told by the two tugboat captains, Pinney and Ditzel. The witnesses for the Noronic may have been mis-

taken as to the position of the King with reference to the position of the Noronic during the period of the maneuvers caused by the several changes in the direction, as the Noronic was backing out and swinging to start on its course to the canal.

The trial court on this important question determined that, after the two ships had rounded to and were on defined courses, the King was the overtaken and the Noronic the overtaking vessel. There is no claim that the Noronic gave any signal to the King that it intended to pass the King, and under this situation it is clear that the Noronic at no time had the right to pass the King without its permission, which, it is conceded, was never asked for or given.

The following rules govern the navigation of vessels in harbors and inland waters generally:

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle. * * *" Rule VIII, section 203, title 33, U. S. C. (33 USCA § 203, Rule 8).

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, * * * shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear. * * *" Section 209, title 33, U. S. C. (33 USCA § 209).

"Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed." Section 206, title 33, U. S. C. (33 USCA § 206).

"Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." Section 208, title 33, U. S. C. (33 USCA § 208).

"In all channels less than five hundred feet in width, no steam vessel shall pass another going in the same direction unless the steam vessel ahead be disabled or signify her willingness that the steam vessel astern shall pass, when the steam vessel astern may pass, subject, however, to the other rules applica-

ble to such a situation. * * *" Section 290, title 33, U. S. C. (33 USCA § 290).

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." Section 212, title 33, U. S. C. (33 USCA § 212).

Agreeing with the facts as found by the trial court that the King was the overtaken vessel, the Noronic must be held entirely at fault for attempting to pass the King without its consent. The North Star (D. C.) 132 F. 145; The M. J. Rudolph (C. C. A.) 292 F. 740; The Kirnwood (D. C.) 201 F. 428, 429. The primary duty of the King, being the preferred vessel, was to maintain her course and keep her speed. The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771.

The trial court recites in its memorandum that "we know of the Noronic maneuvering at or near the end of the Northern Pacific Dock No. 4 (Slip No. 1), with the King nearby, and we have the two vessels entering the canal piers; but from the various witnesses who ought to have known the different positions of the vessels meantime, and have known what was going on, we have little information. In view of the time of the day, climatic conditions and the fact that there were no other vessels nearby to distract attention, this is at least surprising. * * * Neither crew had a right to navigate their respective vessels with any such disregard for the other. The two vessels were approaching the canal piers at the same time from slightly varying directions. There may be some doubt as to just which one crossed the line of the pierheads first. That is not necessarily controlling."

These statements made by the trial court we confirm. Accepting the statements of the witnesses for the Noronic that at or about the time the two ships entered the pierheads most of the Noronic had passed the King, yet at that time an emergency had been created. The evidence discloses without dispute that, where a larger boat is passing a smaller one, such as the boats in this case, the effect of the suction, where the smaller boat is in advance, is to first draw it to the rear, and, when the sterns are abreast, to draw the stern of the smaller boat to the stern of the larger.

That suction of an overtaking vessel is a frequent cause of collision, especially if she is larger than the overtaken vessel and the channel is narrow, is well known. The

Mesaba (D. C.) 111 F. 215; The Aureole (C. C. A.) 113 F. 224; The North Star, supra; The Robert Fulton (C. C. A.) 10 F.(2d) 424. An overtaking vessel takes whatever risks attend her attempt to pass from whatever cause arising, except from the fault of the vessel ahead, The Mesaba, supra; and the burden was upon the Noronic as the overtaking vessel to show that the injury to the King was occasioned by no fault on her part but by some fault or neglect of duty on the part of the King, The Aureole, supra. It may be that the King could have saved itself by a proper maneuver as the danger was apparent, but no claim is here made in the pleadings or in the evidence that the King was at fault in its navigation after the danger had both become apparent and real. It may then have been in danger of colliding with the Noronic or losing its headway and running into the piers. As we have tried to point out, the respondent does not make any claim of negligence on the part of the King in its navigation, except its endeavor to pass the Noronic within the confines of the canal. But finding, as we do, that the Noronic was at one time the burdened vessel and there being no evidence of any change in their relative positions, other than that the Noronic claimed that the King was at all times astern until they entered the pierheads, we must conclude that at or about the time of the entering of the pierheads the Noronic was passing the King and, if we consider, as we must, that it had crept up on and was passing, although it had not completely passed, the King as it entered the piers, it would still be the overtaking vessel endeavoring to pass the King within the piers, which was prohibited by the harbor pilot rules.

As we have heretofore shown, the testimony is noticeably lacking in giving the respective positions of the vessels from the time they left on their courses until they reached the piers. From the positions they held at the start, however, with the King in advance and both vessels having the same distance and traveling at about the same speed and arriving within the pierheads at about the same time, the conclusion is inevitable that the Noronic was at all times more than two points abaft the beam of the King except as she was passing the King. The appellant contends, however, that, even if the King was at one time the overtaken vessel, the situation and position of the two vessels changed before their arrival at the piers, and at that time they were approaching each other at right angles or obliquely so as to involve risk of collision, and that the vessels then

came within the rule known as the "Starboard Hand Rule," which permits the vessel on the starboard to have the right of way. That rule has to do with a situation distinctly stated in the rule "other than when one steamer is overtaking another." The statement by the trial court that the two vessels were approaching the canal piers on converging lines, or from slightly varying directions, is far from a holding that they were approaching each other obliquely so as to involve risk of collision and that their positions were other than one where one steamer was overtaking another.

By an unusual coincidence, photographs were taken of the two vessels as they passed under the aerial bridge. In the first one the King had just reached the aerial bridge and most of the Noronic had passed under it. In the second photograph they had both just passed the aerial bridge. In this short distance the photographs indicate that the King had crept up on the Noronic. The trial court found this to be of small importance, as the King was then within the suction of the Noronic and was being carried along with it. The photographs also show the King at about the center of the canal, with the Noronic on its starboard side. These positions are subject to explanation, and we would agree with the trial court that, under the entire situation as presented by the evidence, they are of relatively small importance. It is beyond the pale of probability that, if the King was in the rear at the time the Noronic entered the piers, it would be so foolhardy as to endeavor to increase its speed and pass the Noronic in the narrow confines of the canal. Such action would result in disaster to the King and probably to the Noronic.

■■ The testimony of the witnesses is in direct conflict, and no useful purpose will be served in setting out and discussing the evidence in detail. A greater number of witnesses appeared for the Noronic, but the weight of the evidence is not determined by the number of the witnesses. It is an established rule in admiralty that, when an appeal involves only questions of fact dependent upon conflicting testimony, the decree of the District Judge who has an opportunity of seeing the witnesses will not be reversed unless the appellate court can clearly say that the decree was against the weight of the testimony. The City of Naples (C. C. A.) 69 F. 794, 796; Elphicke v. White Line Towing Co. (C. C. A.) 106 F. 945; Louisiana Excursion Co. v. Gidionsen (C. C. A.) 217 F. 751.

■ An assignment of error by appellant is that the District Court erred in allowing libelant's witnesses to testify as to the movements of the two vessels in the harbor at Duluth prior to entering the piers of the ship canal; said testimony being inadmissible under the pleadings of this case. This assignment cannot be sustained for several reasons: First, the claimant did not object to the introduction of this evidence at the time the evidence was being introduced; second, the evidence was admissible as bearing upon the question of which of the two boats was passing the other as they entered the canal; and, third, from our holding above that the Noronic was the passing vessel, its action in so doing comes clearly within the charge of negligence that the Noronic negligently attempted to pass the King in this narrow and confined channel. The Noronic having violated the rules governing overtaking vessels, which in this case sufficiently accounts for the damage to the King, all doubt should be solved against her, and she cannot escape liability by suggesting the possible fault of the King. The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84; The Victory & The Plymothian, 168 U. S. 410, 423, 18 S. Ct. 149, 42 L. Ed. 519; Foster v. Merchants' & Miners' Transp. Co. (D. C). 134 F. 964, 969.

The decree of the district court appealed from is affirmed.