NAVEGACION CASTRO RIVA,
S. A. OF PANAMA,
Libellant,

v.

THE M.S. NORDHOLM, her engines, tackle, apparel, furniture, etc., in rem and against Dampskibsselskabet Norden A/S P. Brown, Jun. & Co., in personam, Respondents.

DAMPSKIBSSELSKABET "NORDEN" AKTIESELSKAB, P. BROWN, JUN. & CO., Libellant,

v.

THE S.S. THEOGENNITOR, her engines, tackle, apparel, etc., and against Navegacion Castro Riva, S. A. of Panama, Respondents.

Nos. 3620, 3628.

United States District Court
E. D. Louisiana,
New Orleans Division.
Nov. 24, 1959.

737

Orleans, La., for Navegacion Castro Riva, S. A. of Panama.

Terriberry, Rault, Carroll, Martinez & Yancey, Alfred M. Farrell, Jr., New Orleans, La., for Dampskibsselskabet "Norden", P. Brown, Jun. & Co.

J. SKELLY WRIGHT, District Judge.

In the early morning of May 26, 1958, while ascending the Mississippi River below New Orleans on her maiden voyage, the M.S. Nordholm [1] was rammed by the sheering S.S. Theogennitor. [2] Alleging sole fault, both vessels claim full damages against the other. In the alternative, the Theogennitor claims the right to limit liability. There is also in this consolidated litigation a cargo claim for general average contribution to the Nordholm.

Prior to the collision the Theogennitor was proceeding up river approximately one mile south of Bolivar Point [3] and three to four hundred feet off the east bank. She was making good seven knots over the ground against a four-knot current under the conn of a licensed Mississippi River pilot. At that time the Nordholm was approximately one-half mile astern of the Theogennitor, approximately in mid-river, and proceeding up at about thirteen knots over the ground. She sounded a two-blast signal requesting permission of the Theogennitor for a port passage. The Theogennitor assented by returning the two blasts. Whereupon the Nordholm put her wheel slightly to port and continued up river at the same speed preparatory to passing.

The Nordholm came abreast of the Theogennitor as both vessels were abeam of Bolivar Point Light, lateral distance between the two being 1,000 feet. The

Nelson, Healy, Baillie & Burke, New York City, and Phelps, Dunbar, Marks, Claverie & Sims, John W. Sims, New

1. The M.S. Nordholm, built in 1958, is an ocean-going general cargo vessel of Danish registry, 460' 11" in length overall, 58' 3" in beam, 27' 4½" in summer draft, 7,100 registered gross tons with 7,000 horsepower. She was manned and owned by Danes.

2. The S.S. Theogennitor, built in 1943, is an ocean-going steamship of Panamanian registry of the Liberty ship type, 440' 6" in length overall, 57' 2" in beam, 27' 8½" in summer draft, 7,050 registered gross tons, with 2,500 horsepower. She was manned and owned by Greeks. Her legal title, however, was in a Panamanian corporation.

3. Bolivar Point marks a 45° bend to starboard in the Mississippi River for up-bound vessels. The river at this Point is approximately 2,100 feet wide.

Mississippi River pilot conning the Nordholm, after satisfying himself that the passage would be without incident, went from the right wing to the left wing of the bridge to make a binocular survey of the river on that side up to Triumph Shoal Buoy Light, on which light the Nordholm was now steadying after having rounded the Point deep in the bend.

The Theogennitor, navigating in the slack water under the Point, was given easy right, then full right rudder in an effort to shape her course around the Point. As her bow came out of the slack water, it was met on the starboard side by the current of the river coming down and around the Point. The vessel, instead of taking the right rudder, proceeded ahead and across the river under the influence of the current. When it became apparent to her pilot that the Theogennitor was not rounding the Point, he flashed a light on the wheel indicator to see whether the Greek helmsman had executed his order for full right rudder. On seeing that the rudder was full right, he sounded the danger signal. At that time the Nordholm was little more than a shiplength away and the Theogennitor was aimed at her bow. Nevertheless, the Theogennitor continued full speed ahead until the vessels were only 200 feet apart. At that time, according to her pilot, the Theogennitor's engines were ordered reversed. The scrape engine log of the vessel, however, contains the following entry: "0045, full astern, collision."

Meanwhile, on the Nordholm the lookout on her bow saw the oncoming Theogennitor and ran astern for his life. The second mate on watch also noticed the oncoming Theogennitor a second before she sounded the danger signal. The Nordholm's pilot, still surveying the west side of the river, heard the danger signal, saw the Theogennitor, gave full left rudder

and then, without waiting for the vessel to react, gave full right rudder. The collision occurred seconds later 700 feet off the west bank with the Theogennitor ramming the Nordholm immediately astern of her engine room spaces in the No. 4 hold at a 70-degree angle. Both vessels were heavily damaged.

The Theogennitor, apparently on the theory that a good offense is the best defense, contends that the Nordholm is solely at fault in that, being the overtaking vessel, she failed to keep out of the way of the vessel overtaken.[4] The Theogennitor places the blame for her own failure, as the overtaken vessel, to maintain her course[5] on the current. She further alleges that she was in all respects seaworthy in spite of her inability to control her own actions and that, in any event, she should be allowed to limit her liability.

The Nordholm's position is that she was free from fault, that the sole cause of the collision was the failure of the Theogennitor to turn the Point. She maintains that this failure shows gross negligence and unseaworthiness on the part of the Theogennitor in addition to a violation of the Inland Rules covering overtaking situations.[6]

The charge that the Nordholm was solely at fault in this collision is but a brazen attempt on the part of the Theogennitor to cover her own shortcomings. The evidence shows that this old Liberty ship was loaded to the gunwales. Whether she was above her Plimsoll mark is not definitely established. Her own log shows that when she left Port Kaiser, Jamaica, she was one inch above her summer mark. Her officers, after suggesting that this log entry is probably inaccurate since the measurement was made when the vessel was in a roadstead, then calculate that by the time

4. Inland Rules, art. 24 (33 U.S.C.A. § 209), reads in part:
"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel. * * *"

5. Inland Rules, art. 18, Rule VIII (33 U.S. C.A. § 203), reads in part:
"* * * The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel. * * *"

6. See Note 5.

the Theogennitor reached the Mississippi River she had used enough fuel and water to bring her under her mark. The evidence on this issue of overloading is certainly not conclusive. The only certain conclusion one can draw from it is that if the Theogennitor was not actually overloaded, she was on the ragged edge.

■ Certainly the Theogennitor was too underpowered to control her load. The most persuasive proof of this fact is the fact that she did not. She was unable to turn the Point. To excuse this inability and to place the blame for this collision on the current would be to open the season on shipping in the Mississippi River.[7] Vessels are powered to control the current, not to let the current control them. This vessel, built in a wartime emergency, was marginally powered at birth with 2,500 horsepower. And since that time, as her own pilot testified, many of her horses have long gone to pasture. Moreover, instead of turning up her designed 76 RPM, the Theogennitor limited herself to 66. Under the circumstances it is understandable why the current took over the navigation of the vessel.

In addition to this apparent unseaworthiness on the part of the Theogennitor, there was also a human failure which contributed to this collision. Her pilot, knowing her deeply laden condition as well as her lack of power, continued the Theogennitor in the slack water under the Point until her starboard bow alone

was subjected to the full thrust of the current. The effect thereof was to turn her head to port and thus place the vessel broadside to the current. The Theogennitor's desire for the slack water under the Point is understandable, but her pilot should have realized that there would come a time when she would have to face the current and he should have prepared her therefor. He should have brought her out into the river before reaching the Point so that the whole vessel would be navigating with respect to the current when its full thrust was felt around the Point. Exposing the bow of this heavily laden, underpowered vessel to the current while her stern was still in slack water was a contributing cause of this collision.

Even after the Theogennitor began her sheer to port, the collision could have been averted by letting go the starboard anchor[8] and reversing her engines.[9] But this elementary maneuver was not even considered by the inept crew of the Theogennitor. There was not even a seaman on the bow to let the anchor go if the command were given. The suggestion that dropping the anchor would merely result, not in stopping the vessel, but in snapping her chain is unacceptable. Even snapping the chain may have assisted in breaking the sheer. The truth of the matter is that, with the possible exception of the captain and the chief engineer, the officers of the Theogennitor were untrained.[10] None of her

7. Inability to control a vessel in a known current is fault. Christie & Lowe v. Fane S.S. Co., 5 Cir., 159 F. 648; The Australia, 6 Cir., 120 F. 220; Long Island R. Co. v. Killien, 2 Cir., 67 F. 365.
   Compare The Gulftrade (Charles Warner Co. v. Independent Pier Co.), 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195; The City of Macon, 5 Cir., 51 F. 949; Northern Nav. Co. v. Minnesota Atlantic Transit Co., 8 Cir., 49 F.2d 203.

8. See Bisso v. Waterways Transportation Co., 5 Cir., 235 F.2d 741, 1956 A.M.C. 1760.

9. The failure of the Theogennitor to stop and reverse when the danger signal was sounded is such an obvious fault that comment thereon is hardly required.

Here, in addition to stopping the vessel, or at least making it possible to pass under the stern of the Nordholm, reversing her engines might have broken her sheer, since reversing would have tended to throw her stern to port. Knight, Modern Seamanship, 8th Ed., pp. 337–342.

10. The incompetence of the unlicensed mate on watch at the time of collision is demonstrated by this excerpt from his testimony. He was being questioned about the 40 to 45° turn to starboard at Bolivar Point:

"Q. As a man who sails as ship's officer, I'd like you to take a look at this chart and give us your best estimate of the number of degrees turn that were necessary for the Theogennitor to take in

officers, except these two, had licenses from any country covering their positions on the vessel. Some of the officers had no licenses of any kind from anywhere.[11]

It is true that the incompetence of her crew does not in itself saddle the Theogennitor with fault or deny her owner the right to limit. It is further true that at the time of this collision the vessel was under the conn of a qualified Mississippi River pilot. But the vessel cannot be abandoned to the pilot. The responsibility of the crew persists. The China, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67; Jure v. United Fruit Co., 5 Cir., 6 F.2d 6. Part of the crew's responsibility consisted in letting go the starboard anchor to stop the vessel or break her sheer. This was not done, not because of her negligence, but because the crew, and particularly the officers thereof, were not properly trained to perform their duties as seamen.

This collision resulted through the sole fault of the Theogennitor. The

Nordholm was free from fault. It is true that she, as the overtaking vessel, assumes the risks inherent in passing. See Griffin, Collision, § 61. But she does not assume the risk of a vessel sheering half way across the Mississippi River.[12] The Nordholm kept a lateral distance of a thousand feet from the Theogennitor which, under the circumstances, should have been ample. The fact that the passing took place at a bend in the river has been criticized by the Theogennitor. But the Theogennitor assented to the passage. This assent, of course, does not in itself absolve the Nordholm from fault in the premises. The Gulftrade, supra. It does show that two experienced Mississippi River pilots felt that, under the circumstances as they existed at that time, the proposed passage was neither unusual nor unsafe. Moreover, there was ample room to complete the maneuver safely. There was no other traffic in the river at the Point and there was no other reason why the Nordholm should have held back.

order to continue her intended course around the point. A. Ninety. I don't know the amount of miles here involved.

"Mr. Sims: Those are depth marks.

"A. We were coming this way (indicating).

"Mr. Farrell: The record shows he is—

"A. We went here and couldn't turn.

"Q. You estimate on the basis of your viewing this chart that the intended turn was about 90 degrees? A. It could be, could be not.

"Q. I don't understand the answer. I am asking you to estimate the number of degrees of the compass, of which there are 360. A. I don't remember exactly the degrees that the ship—

"Q. I didn't ask you that. Now you have told us that you sailed on this ship as third officer. A. Yes.

"Q. I have given you an enlargement of a navigational chart of the Mississippi River. On the basis of your knowledge and your viewing of this chart, simply give us your best estimate of the number of compass degrees.

"Mr. Sims: Why don't you say the number of degrees course change?

"Q. The number of degrees course change necessary to make the turn. A.

The pilot changes them, I don't.

"Q. Do you stand a watch at sea? A. Yes.

"Q. What watch? A. Twelve to 4:00.

"Q. Did you stand the 12:00 to 4:00 on the Theogennitor? A. Yes.

"Q. Are you familiar with laying out courses on charts? A. In sea, yes.

"Q. If a vessel is parallelling her right hand bank below Bolivar Point Light and intends to turn to starboard in order to follow a course parallel the bank above Bolivar Point Light, approximately what course change would be necessary, in your opinion, after viewing this chart? A. It would be turning right." (Karnaros, pp. 70, 71, 72, 73).

11. The Theogennitor had only six officers, a captain, chief mate, second mate, chief engineer, and two assistants. The chief mate had no license as such. The second mate, who was on duty at the time of the collision, apparently had no license of any kind. The two assistant engineers were also without licenses.

12. Long Island R. Co. v. Killien, supra. Compare The City of Macon, 5 Cir., 51 F. 949.

The cases [13] cited by the Theogennitor condemning vessels for passing at a point were decided on their own facts. They certainly are not authority for the proposition that under no circumstances can passage be made around points. Each case must be decided on its own facts. Suffice it to say that on the facts here the proposal to pass in the bend was proper, and the passage would have been executed with complete safety except for the actions of the Theogennitor.

The other allegations of fault against the Nordholm are completely without merit. Her power was such that she was able to make thirteen knots over the ground against the current. Under the circumstances that was the proper speed. It is unfortunate that the Theogennitor did not have enough power to do likewise. If she had, she too would have been able to control her head against the current. The other faults attributed to the Nordholm, the indecisive left and then right rudder and her failure to stop, were in extremis.[14] The personnel on the Nordholm were aware of the sheer of the Theogennitor almost as soon as her own pilot. There was no time for evasive action. Stopping and reversing the vessel, if there had been time, would only have resulted in her being rammed in the engine room spaces. Even if some fault can be found in the navigation of the Nordholm, such fault would be minor as compared to the gross fault of the Theogennitor.[15]

The unseaworthiness of the Theogennitor, as a contributing cause of this collision, has been demonstrated. The question remains as to whether this unseaworthiness was within the privity and knowledge of her owner. On this issue the burden of proof is upon the petitioner in limitation.[16] To establish the right to limit, the owner must show that it was unaware of the incompetence of the Theogennitor's crew, that it was unaware of the condition of the Theogennitor's power and her load at the time in question. The only evidence offered by the Theogennitor in this connection, other than the testimony of the crew, was some documents from the American Bureau of Shipping indicating that the Theogennitor had been continued in class and was otherwise seaworthy. The classification society's opinion as to the seaworthiness of a vessel does not resolve the question.[17] It has been this Court's experience that classification societies often continue vessels in class long after their highest and best use would be as scrap.[18] Moreover, the ABS documents do not relate in any way to the competence of the Theogennitor's crew [19] or the condition of her load at the time in question. The petitioner in limitation has made no effort whatever to show that the officers of the Theogennitor were licensed under law of any nation, including Panama, nor have the laws of any nation, including Panama, been introduced to show that officers of vessels flying the flag thereof need not be licensed.[20]

13. The Pleiades, 2 Cir., 9 F.2d 804; The Clement Smith, D.C., 9 F.2d 174; The Mesaba (The Martello), D.C., 111 F. 215.

14. The Ludvig Holberg, 157 U.S. 60, 15 S. Ct. 477, 39 L.Ed. 620; The Favorita, 18 Wall. 598, 85 U.S. 598, 603, 21 L.Ed. 856; Genesee Chief v. Fitzhugh, 12 How. 443, 53 U.S. 443, 460, 13 L.Ed. 1058.

15. The Victory (The Plymothian), 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; The Oregon, 158 U.S. 186, 204, 15 S.Ct. 804, 39 L.Ed. 943; The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; Compania De Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120.

16. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; The Cleveco, 6 Cir., 154 F.2d 605; The E. Madison Hall, 4 Cir., 140 F.2d 589.
See also Gilmore and Black, The Law of Admiralty, p. 705.

17. Sabine Towing Co. v. Brennan, 5 Cir., 72 F.2d 490, 494.

18. United Distillers of America v. The Ionian Pioneer, D.C., 130 F.Supp. 647.

19. The shipowner's duty to provide a competent crew is non-delegable. The Midland Victory, 2 Cir., 178 F.2d 243, 252; In re Pacific Mail S.S. Co., 9 Cir., 130 F. 76, 69 L.R.A. 71.

20. The Midland Victory, supra.

It is time that admiralty courts protect responsible shipping against old and underpowered, shadowy-owned tramps, flying the flag of any nation, and manned by the flotsam of the world. Where the evidence warrants, owners of such vessels should be denied the right to limit, even though the denial thereof may be a vain and useless gesture since the legal ownership of such vessels is usually in one-vessel corporations. Thus the real owners are protected, limitation or not.

Decrees accordingly.